**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Vincent Moran DOSS, Defendant-Appellant.**

**No. 75–1463.**

United States Court of Appeals, Sixth Circuit.

Decided Sept. 23, 1977.

Robert W. Andrews, Erich W. Merrill, Memphis, Tenn., for defendant-appellant.

Thomas F. Turley, U. S. Atty., W. Hickman Ewing, Jr., Memphis, Tenn., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and WEICK, EDWARDS, CELEBREZZE, PECK, LIVELY and ENGEL, Circuit Judges, sitting en banc.

EDWARDS, Circuit Judge.

On November 18, 1976, a panel of this court[1] released an opinion reversing two perjury convictions of appellant Doss and remanding them to the District Court for dismissal of the perjury indictments, 545 F.2d 548. The panel opinion held that the facts in the case showed "an abuse of the grand jury process . . . by the United States Attorney. . . . [because] appellant had been twice secretly indicted and was unwarned of those facts. . . . [but] the United States Attorney undertook substantial questioning of appellant about the subject matter of the secret indictments."

The holding of the case was set forth as follows:

Where a substantial purpose of calling an indicted defendant before a grand jury is to question him secretly and without counsel present without his being informed of the nature and cause of the accusation about a crime for which he stands already indicted, the proceeding is an abuse of process which violates both the Sixth Amendment and the due process clause of the Fifth Amendment. Indictments for perjurious answers given in such a proceeding must be quashed because the proceeding itself is void.

A footnote pertaining to this holding was appended which read as follows:

We make no comment upon what result would flow from calling a defendant indicted for one crime to appear and give evidence before a grand jury upon a wholly different and separable offense, since no such facts are before us.

Subsequent to the issuance of the panel opinion, the United States Attorney filed a petition for rehearing and a suggestion for rehearing en banc. A majority of the active judges of the court having voted in favor of rehearing en banc, and all issues previously submitted having been reconsidered by the court as a whole, the views previously expressed in the panel opinion are reiterated as set forth hereafter, except for the footnote referred to above. For the advice of the United States Attorneys in the four states of our Circuit, we also consider the question left open by the footnote in the panel opinion and express the view that where a defendant is indicted for a particular crime, that fact does not prevent his being called before a grand jury to give evidence upon a wholly different and separable offense so long as he is not questioned about the offense for which he stands indicted.

The facts in this case, due largely to appellant Doss' extensive criminal activity, are complex ones. After Doss had been convicted in three separate jury trials on a variety of felony charges resulting in cumulative sentences totaling 15 years, he was also tried on an indictment consisting of four counts of perjury based on his testimony before a federal grand jury. Count I

[1.] The panel consisted of Judges Edwards, McCree and Miller. The Honorable William E. Miller died April 12, 1976, and did not participate in the panel decision of this case. The Honorable Wade H. McCree, Jr., resigned from the United States Court of Appeals for the Sixth Circuit to become Solicitor General of the United States on March 28, 1977, and did not participate in the en banc rehearing of this case.

was dismissed by the District Judge. At jury trial appellant was found not guilty on Count II, but was found guilty on Counts III and IV. The District Judge sentenced him on Counts III and IV to three years in the penitentiary to be served concurrently with each other and with other longer sentences. (See Appendix A for indictments.)

The principal problem in this appeal arises from the fact that appellant's testimony before the grand jury took place after he had been the subject of two sealed indictments.

One indictment alleged:

On or about the 26th day of January 1972, in the Western District of Tennessee, Western Division,

– – – – VINCENT MORAN DOSS – – – – did cause Paul Patterson to keep and conceal in his possession, and to transport through the Western District of Tennessee fifty (50) counterfeit Twenty ($20.00) Dollar Federal Reserve Notes, Serial No. F29392932A, Series 1969, bearing the seal of the Federal Reserve Bank of Atlanta, Georgia, of a purported face value of approximately One Thousand ($1,000.00) Dollars, made after the similitude of obligations issued under the authority of the United States, in violation of Title 18, United States Code, § 472.

The other secret indictment read:

On or about the 5th day of November 1971, in the Western District of Tennessee, Western Division,

– – – – VINCENT MORAN DOSS – – – – did knowingly cause Nolan Ray Williamson and Paul Patterson to possess with intent to distribute approximately twenty thousand (20,000) capsules made up of a substance containing amphetamines, a controlled substance listed in Schedule II, § 812, Title 21, United States Code, in violation of Title 21, United States Code § 841(a).

When Doss was called before the grand jury, the Assistant United States Attorney informed him that he was "a target" of criminal investigations and had a constitutional right to remain silent. Doss was given full *Miranda*-type warnings and was allowed to consult with his lawyer who was present outside the grand jury room. He was not, however, advised that he was already under two indictments by that same grand jury. And, of course, he was not allowed to have counsel present with him in the grand jury room.

Appellant Doss refused on Fifth Amendment grounds to answer a number of questions. He did, however, answer many questions, four of which resulted in his indictment for perjury. One of these pertained to a statement the government alleged as a basis for Count I of the perjury indictment to the effect that he (Doss) had never had any business dealings with Paul E. Patterson, when in fact he purchased a controlled substance, 20,000 amphetamines, on or about November 6, 1971, from Paul E. Patterson. *See* Appendix A. The 20,000 amphetamines referred to in the first count of the perjury indictment were the same 20,000 capsules containing amphetamine which were the subject of the secret drug indictment against Doss. In the course of the grand jury proceedings, Doss was asked the following questions:

Q Now, do you know a person by the name of Larry Jamison?

A Yes, sir.

Q How do you know Larry Jamison?

A I really don't know. I met Larry Jamison many years ago, I'd say back in the fifties, but I don't know how I knew him.

Q Did you meet him here in Memphis?

A I don't think so. I met him in Cairo, Illinois, when I first met him.

Q Do you know that Larry Jamison has been convicted in federal court?

A No, no.

Q Do you have any business dealings with Larry Jamison?

A No, sir.

\* \* \* \* \* \*

Q Do you know a person by the name of Paul E. Patterson?

A Oxford, Mississippi?

Q Yes, sir. How do you know Mr. Patterson?

A   I'm not sure.  I met Mr. Patterson—I don't know, I don't remember where I met him.

Q   Do you have any business dealings with him, or is it a personal relationship?

A   No.

Q   Pardon?

A   What did you say?

Q   Do you have any business dealing with Mr. Patterson, or is it just a personal relationship?

A   Could I speak to my attorney?

A   Yes.

(Witness leaves grand
jury room)

———

THE FOREMAN:  You are still under oath, sir.

A   Upon advice of my counsel, I have been instructed not to answer any questions which might tend to incriminate me. I invoke my privileges granted or guaranteed by the Fifth Amendment of the Constitution of the United States.

Q   That has reference to the last question that I asked you, is that right?

A   Yes.

\*    \*    \*    \*    \*    \*

Q   Do you know a man named Nolan Ray Williamson?

A   Yes.

Q   How do you know Nolan Ray Williamson?

A   Well, I met him, I guess, in about 1967 or 68 when he was in Cairo.  At the time, he was looking for some kind of business, nightclub business or something, I don't know; I just was around the places that he was and got acquainted with him.

Q   Do you have a friendly relationship with him?

A   Yes.

Q   Did you ever have any business dealings with him?

A   Can I talk to my lawyer?

Q   Yes.

(Witness leaves grand
jury room)

———

THE FOREMAN:  You are still under oath.

A   Upon advice of my counsel, I have been instructed not to answer any questions which might tend to incriminate me. I invoke my privilege granted or given or guaranteed by the Fifth Amendment of the Constitution of the United States.

Q   So far as you know, have you always known Nolan Ray Williamson to be a truthful person?

A   Truthful?

Q   To the extent that you know.

A   I just wouldn't know, I don't know.

Q   Did he ever, to your knowledge, lie to you?

A   I just wouldn't know.

Q   Do you think this grand jury should believe what he would tell this grand jury?

A   I can't answer that, I can't say.

Q   If, under oath, he were to tell the grand jury some things about yourself, do you think this grand jury should believe him?

A   Well, it would depend on what it was.  I don't know.

Q   If it had anything to do with criminal dealings, should this grand jury believe him?

A   Could I speak to my lawyer?

Q   Yes.

(Witness leaves grand
jury room)

———

THE FOREMAN:  You are still under oath, sir.

A   I do not know about him.

Q   All right, the grand jury will have to do whatever the grand jury feels it is called upon to do, is that right?

A   I'm sure.

■   The importance of these questions to the government's secret indictment of Doss on the amphetamine count is simply that the three men about whom he was ques-

tioned above were the three principal figures in the illegal amphetamine transaction, all of whom were called by the government to testify against Doss at his trial on the amphetamine charge.[2]

Larry Jamison's relationship is vividly portrayed by his testimony during the course of the Doss drug trial:

DIRECT EXAMINATION
BY MR. PARRISH:

Q. Would you state your full name, please?

A. Larry Thomas Jamison.

Q. Mr. Jamison, where is your residence?

A. Tunica, Mississippi.

    \*    \*    \*    \*    \*    \*

Q. Approximately how long have you been knowing Mr. Doss?

A. Well, off and on about ten years.

    \*    \*    \*    \*    \*    \*

Q. You have been knowing him about ten years, and you met him in Cairo, Illinois?

A. Yes, sir.

Q. Do you know Paul E. "Pep" Patterson?

A. Yes, sir, I do.

Q. About how long have you known him?

A. About two and a half or three years.

Q. Did you ever introduce Mr. Doss to Mr. Patterson?

A. Yes, sir, I did.

Q. How come you to introduce them?

A. Mr. Patterson wanted me to call Mr. Doss, and he wanted to meet him, and I called Mr. Doss, and he wanted to buy some pills from him.

Q. You say Mr. Patterson wanted to meet Mr. Doss?

A. Yes, sir.

    \*    \*    \*    \*    \*    \*

2. The two secret indictments, one for causing Nolan Ray Williamson and Paul E. Patterson to possess with intent to distribute 20,000 amphetamine capsules, and the other for causing Paul E. Patterson to possess and transport $1,000 of counterfeit currency, were tried at the same time. We take judicial notice of the Joint Appendix in these cases. It is a part of this court's record in relation to appeals of guilty verdicts in the joint trial in *United States v. Doss*, No. 74–1722 and No. 74–1723, affirmed January 9, 1976, by unpublished per curiam. Contrary to the opinion expressed by the dissent, we believe that our taking judicial notice of our own court's record is wholly consistent with the provisions of Rule 201 of the Federal Rules of Evidence, particularly Paragraphs (b), (c) and (f).

Rule 201 provides:
**Rule 201. Judicial Notice of Adjudicative Facts**

(a) **Scope of rule**. This rule governs only judicial notice of adjudicative facts.

(b) **Kinds of facts**. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) **When discretionary**. A court may take judicial notice, whether requested or not.

(d) **When mandatory**. A court shall take judicial notice if requested by a party and supplied the necessary information.

(e) **Opportunity to be heard**. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) **Time of taking notice**. Judicial notice may be taken at any stage of the proceeding.

(g) **Instructing jury**. In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

The Supreme Court has taken judicial notice of its own record of another case between the same parties. *National Fire Ins. Co. v. Thompson*, 281 U.S. 331, 336, 50 S.Ct. 288, 74 L.Ed. 881 (1930), *cited with approval in Shuttlesworth v. Birmingham*, 394 U.S. 147, 157 n.6, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

*See also New York Indians v. U.S.*, 170 U.S. 1, 32, 18 S.Ct. 531, 42 L.Ed. 927 (1893); *International Brotherhood of Teamsters v. Zantop Air Transport Corp.*, 394 F.2d 36, 40 (6th Cir. 1968); *Moore v. Estelle*, 526 F.2d 690, 694 (5th Cir.), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1192 (1976); *Paul v. Dade County*, 419 F.2d 10, 12 (5th Cir. 1969), *cert. denied*, 397 U.S. 1065, 90 S.Ct. 1504, 25 L.Ed.2d 686 (1970).

Q. As a result of that did you call Mr. Doss?

A. Yes, sir, I did.

Q. What did you tell Mr. Doss?

A. I told Mr. Doss if he would come down there Mr. Patterson wanted to meet him, and he could furnish him with some pills if he wanted them.

Q. Who brought up the subject of pills, you or Mr. Doss?

A. I did.

Q. What did Mr. Doss say?

A. He said he would like to buy some, and he would come on down.

Q. Did he come down?

A. Yes, sir, he did, he came to my house.

Q. Now, how soon was that after you contacted him?

A. He came that night.

Q. Was your house where then?

A. In Memphis on Airways.

Q. When Mr. Doss came to your house did you go anywhere else?

A. I went to Oxford with him, and called Mr. Patterson and went out to the trailer and met Mr. Patterson out there.

*    *    *    *    *    *

Q. Did you introduce one to the other?

A. Yes, sir, I did.

Q. And what transpired in your presence?

A. Well, Mr. Patterson and Mr. Doss talked, they stepped outside and talked, and I was in the trailer. Naturally I don't know what they talked about. Then Mr. Patterson left and was gone quite some time and came back.

Q. Did you hear any conversation or any discussion about pills?

A. Well, I heard Mr. Patterson say he couldn't get any that night, or something like that.

*    *    *    *    *    *

Q. Approximately how long was Mr. Patterson gone?

A. Approximately an hour and a half or two hours.

*    *    *    *    *    *

Q. You heard him tell Mr. Doss he wasn't able to get any that night?

A. Yes, sir, that's right.

Q. Did you hear anything about the future?

A. Only Mr. Patterson told him he would bring some to him.

Q. That's some pills?

A. Yes.

Q. Do you know whether or not Mr. Doss replied that he was interested in him bringing them?

A. I just overheard what was said, he said he would be—he told him to bring them on.

Q. Now, approximately when was this?

A. Oh, I think it was in the fall of '71, I believe it was—sometime the last part of '71.

Nolan Williamson's testimony concerning the government's drug charge against Doss was brief:

DIRECT EXAMINATION
BY MR. PARRISH:

*    *    *    *    *    *

Q. Mr. Williamson, were you convicted in federal court in Atlanta in 1972 of an allegation made in an indictment returned by the Grand Jury, and involving your possession, with intent to sell, certain amphetamines?

A. Yes.

*    *    *    *    *    *

Q. If I were to ask you any questions that might relate to any relationship which you might have, or have had in the past, with Vincent Moran "Red" Doss, would you refuse to answer those questions because of a Fifth Amendment right that you would claim?

A. I definitely would.

Paul E. Patterson was the principal witness against Doss in relation to both the drug and the counterfeit charges. His testimony, quoted in the Joint Appendix of the joint trial, extends over 44 pages and it is clear that after Paul Patterson had been arrested in the early part of 1972 and had

pled guilty to a 48-count drug indictment and another indictment for illegal possession of an automatic weapon, Patterson became an informant for the government. Thereafter asked what he had told government agents at the first meeting after his conversion to the informer role, he responded:

A. I told them Mr. Doss had bought twenty thousand RJS's from me over the phone, and agreed to pay me, and didn't pay me.

Q. And the amount, was that discussed?

A. Yes, sir, it was supposed to be six thousand dollars, but being as he got into it on the other end I agreed to take forty-five hundred.

The transcript of this trial makes clear that "20,000 RJS's" were 20,000 black amphetamine capsules which were controlled substances and illegal to sell. The transcript of the trial also makes clear that Doss bought these for $6,000 from Paul Patterson and made an arrangement to sell them in Atlanta. Patterson testified that Larry Jamison had set up this deal in the first instance, and that Nolan Ray Williamson was the person to whom he delivered the 20,000 amphetamine capsules. He also testified that he was due to be paid the next day in Jackson, Tennessee, but that Doss did not pay him, telling him eventually that they had lost the capsules in Atlanta and that he didn't have any money. Other testimony from federal agents at this same trial indicated that the "loss" in Atlanta was due to the arrest of Nolan Ray Williamson as he was engaged in the transfer of the 20,000 amphetamine capsules to a man named Glover.

We believe it is clear that the Assistant United States Attorney's questions quoted above, addressed to appellant Doss in the grand jury room while he was under a sealed indictment, directly pertained to the government's search for evidence to support its charge that he "did knowingly cause Nolan Ray Williamson and Paul Patterson to possess with intent to distribute approximately twenty thousand (20,000) capsules made up of a substance containing amphetamines . . .."

We note, of course, that in the perjury trial the District Judge dismissed Count I of the indictment on grounds of ambiguity of the purported perjury. We do not, however, consider that this fact in anywise vitiates the relevance of the material dealt with immediately above concerning the amphetamine transaction. It is clear from the court records of the relevant Doss trials which we cite hereafter that the government deliberately and purposefully employed the grand jury in questioning an already indicted defendant about the crime for which he was soon to be tried.

The same comment may be made in relation to Count IV dealing with the charge that Doss knowingly testified falsely that Paul E. Patterson had never offered him any counterfeit money for sale. *See* Appendix A. In relation to this charge, it was the government's contention at Doss' joint trial on the amphetamine and counterfeit charge that when Doss failed to pay Patterson for the 20,000 capsules of amphetamine because his plans for sale were interrupted at Atlanta by federal agents, Doss was left owing Patterson $6,000. Patterson's testimony at Doss' trial shows that more or less voluntarily Patterson reduced the sum that he deemed owing to $4,500, but sought vigorously over a period of time to collect that. In response, Doss came forward with 50 counterfeit $20 bills which Patterson credited to him, according to his testimony, at 15 cents on the counterfeit dollar. Thus the questions and answers before the grand jury quoted above which dealt with Doss' knowing Patterson and having business dealings with him are just as relevant to the government's case in relation to the counterfeit charge against Doss as they were to the amphetamine case. Over and above this, however, the following questions and answers from the grand jury transcript must be considered:

Q Did you know George Lenox?

A No, sir.

Q Do you know anything about his death?

A I have read it in the papers.

Q Is that the extent of all the knowledge you have of that?

A That's right, that's all.

Q How about Herb Brubaker?

A Yes, sir.

Q Herb Brubaker presently has charges pending against him in Kentucky?

A Yes, sir.

Q What do you know about Herb Brubaker?

A What do I know about him?

Q Yes.

A When I first knew Herb Brubaker was in 1950. I was in Covington, Tennessee, at that time and Herb Brubaker and a guy by the name of Crawford, and another name that I can't remember, was in trouble here in Memphis on a car deal, and they were up there in Covington at that time. That is how I first knew Herb Brubaker.

Q Have you maintained some sort of relationship with him ever since then?

A Pardon?

Q Have you maintained some sort of relationship with him ever since then?

A Oh, yes. I seen him about a year or two ago.

Q Have you remained on friendly terms with him?

A Yes, sir, yes.

At the Doss counterfeit trial, Patterson testified that Herb Brubaker told him that the counterfeit Doss had furnished Patterson was worth fifteen cents on the dollar. The Grand Jury testimony continues:

Q Do you know Jim Aaron in Bruce, Mississippi?

A Jim who?

Q Aaron.

A From Bruce, Mississippi?

Q Yes.

A Will you tell me what he does, or something?

Q Well, you know Kenny Day in Chicago?

A Who?

Q Kenny Day.

A No.

Q Do you know anything about a stolen car ring which also deals some in counterfeit money between Chicago and New Orleans, between Kenny Day and Jim Aaron?

A No.

Q What about a Henry Brett in Bruce, Mississippi, a partner of Jim Aaron?

A No.

Patterson also testified at the Doss counterfeit trial that he (Patterson) took the counterfeit which Doss furnished him to Calhoun County, Mississippi and there sold it to Hayden Skyles and another man later identified as Eli Blount. Skyles and Blount were arrested in Calhoun County by the Sheriff for passing the counterfeit. Bruce, Mississippi, where Aaron and Brett lived is in Calhoun County, Mississippi.

The U.S. Attorney also questioned Doss as follows:

Q Has Paul E. Patterson ever tried to sell you any counterfeit money?

A No, sir, or if he did, I don't know anything about it.

Q Now, Mr. Doss, did you have anything to do with the disposal of an automobile that was used in the murder of George Lenox?

A No, sir, no, sir, nothing.

Q Such a Cadillac automobile was never given to you by Nolan Ray Williamson for that purpose?

A No, sir, no, sir.

Q So anybody, including Nolan Ray Williamson, who has told us to the contrary would be lying about that?

A Right, right.

Q I think you previously said you know nothing about the Lenox murder?

A I know nothing, what I read in the paper.

As we noted in relation to the amphetamine questioning, here, again, the government questions Doss before the grand jury after he has been secretly indicted for causing Patterson to possess and transport

counterfeit. These questions bear directly upon Doss' relationships with the man whom the United States Attorney who was questioning him knew would be the primary witness against Doss on the counterfeit matter. There was also questioning pertaining to his relationships with Nolan Ray Williamson, whom the United States Attorney knew would be an important witness in the forthcoming trial of the secret indictments. At the trial Patterson testified directly that, when he went to Cairo to collect the $4,500 debt for the amphetamine capsules from Doss in January 1972, Doss threw him a brown paper sack containing $20 bills, that these were counterfeit, and that Patterson told Doss to take off the value of the bills at "ten cents or fifteen cents on the dollar," which Doss said was the going value of the bills. During Patterson's testimony in the Doss perjury trial, a tape of a phone call from Patterson to Doss, on October 16, 1972, was played and Patterson was questioned about that as follows:

Q  On this tape do you talk to him about him needing any "green"?

A  Yes, sir.

Q  And do you make a statement like, "That green like you give me up there you know". What were you referring to there?

A  I don't recall.

Q  Let me ask you if you recall this statement:

"And if you get to needing any of that green like you give me up there". Do you know what you were referring to?

A  To the thousand dollars he had given me.

Q  In what?

A  Counterfeit money.

Q  Do you state on here that you have got some?

A  Yes, sir, I did.

Q  In different denominations?

A  Yes.

Q  And do you state:

"If you can use it in any way let me know about it."

A  Yes, sir, I did.

Q  And do you assure Mr. Doss that it is good stuff?

A  Yes, sir.

Thus Doss' denial in Count IV that Patterson had ever offered him counterfeit money for sale in October of 1972 might be regarded as a totally different transaction from the January 26, 1972, episode when Doss gave Patterson $1,000 of counterfeit money to offset the amphetamine debt. In fact, however, the two were directly related to government efforts to establish Doss' guilt on the counterfeit charge on which he had been secretly indicted. In this regard it is important to note 1) that Patterson's offer was made in cooperation with government agents and with no intention of committing a crime, 2) the conversation was initiated by Patterson so as to elicit Doss' recognition (with a third party listening) that he had indeed transferred counterfeit to Patterson on the earlier date. We think it is clear that the government deliberately made use of the grand jury to help prepare its case for Doss' trial on the counterfeit charge just as they had done in relation to the amphetamine charge.

The other two counts of the perjury indictment deal with "two or three hundred guns which had been stolen from a Navajo Freight Lines truck." The perjury trial jury found Doss not guilty on Count II pertaining to these guns, but found him guilty on Count III because he had denied before the grand jury discussing these guns with Paul Patterson during September and October of 1972.

In our prior panel decision concerning this case, we had stated that "Count III of the indictment was totally unrelated to the offenses for which he [Doss] had been indicted." Closer acquaintance with the Joint Appendix of the Doss trials on the secret indictments pertaining to amphetamines and counterfeit shows that even this may not be unrelated. As shown in Appendix B attached to this opinion, the United States Attorney, Mr. Parrish, successfully propounded to the court the theory that any discussion of illegal means for settling the

amphetamine debt between Doss and Patterson should be allowed to go to the jury. When we recognize that all conversation about stolen Treflan (a valuable agricultural chemical) and stolen guns between Patterson and Doss was initiated by government agents, as is made crystal clear in the record of the Doss trial, it becomes increasingly obvious that the government was employing the grand jury testimony of the secretly indicted witness for the substantial purpose of preparing testimony against him.

▊ We turn now to a discussion of the legal implications of these facts. The cases previously argued in this appeal by appellant include *United States v. Lawn*, 115 F.Supp. 674 (S.D.N.Y.), *appeal dismissed sub nom. United States v. Roth*, 208 F.2d 467 (2d Cir. 1953), and the Fifth Circuit's opinions in *United States v. Mandujano*, 496 F.2d 1050 (5th Cir. 1974), and *United States v. Rangel*, 496 F.2d 1059 (5th Cir. 1974).

In the last two of these cases, the Fifth Circuit held that perjurious grand jury testimony should be suppressed because of Fifth Amendment violations. These holdings are now overruled by the Supreme Court's ruling in *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). There the Supreme Court unanimously held that the abuse of Fifth Amendment rights found by the Fifth Circuit did not excuse perjury.

Subsequently the Supreme Court reiterated this holding in *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977). The same holding was applied to a potential defendant so as to allow use of his grand jury testimony at his subsequent trial in *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). In no one of these three cases, however, had the witness been indicted—much less secretly indicted.

Significantly for our present problem, in the *Mandujano* case the Supreme Court implied, citing *Brown v. United States*, 245 F.2d 549 (8th Cir. 1957), that there could be abuse of process requiring voiding of a perjury indictment.

In *Brown* the Eighth Circuit stated the principal issue as follows:

The record makes it clear that the counts in question have to do with answers given by defendant while under oath before a grand jury called, sworn and sitting in the district of Nebraska and that the offenses charged in these counts have to do with matters which occurred in the Eastern District of Missouri. If the grand jury of Nebraska was without authority to inquire into offenses committed in Missouri, then the answers of defendant, even if false, would not amount to perjury.

*Brown v. United States, supra* at 552.

The Eighth Circuit's analysis of the record found that no evidence pertaining to the Missouri events on the basis of which Brown was indicted for perjury was relevant to any offense committed in Nebraska and that Brown's answers could not be made the basis for a perjury prosecution, since the grand jury was acting beyond its powers in conducting the inquisition.

Justice Stewart's opinion in the *Mandujano* case summarized the holding of *Brown v. United States* by saying, "the perjury prosecution must be barred because of prosecutorial conduct amounting to a denial of due process . . . ." *United States v. Mandujano, supra* [425 U.S.] at 609, 96 S.Ct. at 1793 (Stewart, J., concurring opinion).

We believe our present appeal presents similar prosecutorial abuse and violation of due process.

In Justice Brennan's concurring opinion in *Mandujano* he points out:

It is clear that the government may not in the absence of an intentional and knowing waiver call an indicted defendant before a grand jury and there interrogate him concerning the subject matter of a crime for which he already stands formally charged. *Lawn v. United States*, 355 U.S. 339 [78 S.Ct. 311, 2 L.Ed.2d 321] (1958); *United States v. Calandra*, 414 U.S. [338 (1974)] at 345, 346 [94 S.Ct., at 618, 38 L.Ed.2d, at 569].

*United States v. Mandujano, supra* at 594, 96 S.Ct. at 1785 (Brennan, J., concurring opinion).

This is, however, exactly what has been done in our instant case and it leads directly to our reversal of these convictions. In *Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct. 406, 100 L.Ed. 397 (1956), Mr. Justice Black sustained an indictment based upon hearsay under the historic broad powers of the grand jury as preserved in our criminal law by the Fifth Amendment to the United States Constitution. *See also United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). In his concluding paragraph, however, he noted in contradistinction, "In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict."

When a person under our system of law has been indicted for a crime, the government has no more right to call him before a grand jury and question him about that crime than it has to call an unwilling defendant to the stand during trial of the case. *United States v. Lawn*, 115 F.Supp. 674, 677 (S.D.N.Y.1953). *See also In re National Window Glass Workers*, 287 F. 219, 227–28 (N.D.Ohio 1922).

On this issue the District Judge in *United States v. Lawn, supra*, said:

A mere witness may properly be subpoenaed to appear and testify before the grand jury, though he may not be compelled to incriminate himself, *Blair v. United States*, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979, and he need not be warned of his privilege but to avail himself of it he must plead it whenever the answer to a question may incriminate. *United States v. Benjamin*, 2 Cir., 1941, 120 F.2d 521; *United States v. Miller*, D.C., 80 F.Supp. 979.

However, upon the trial of the defendant in a criminal case, it would be a clear violation of a defendant's right against self-incrimination under the Fifth Amendment of the Constitution to compel him to take the stand, testify and produce his records, relating to the matter with which he is charged. Unless he volunteers, it would invalidate the trial. *United States v. Housing Foundation of America, Inc.*, 3 Cir., 1949, 176 F.2d 665. Title 18 U.S.C.A. § 3481 makes a defendant a competent witness *at his own request*. It is thus improper to call him as a witness without a request on his part. 8 Wigmore on Evidence, 3rd Edit., p. 393; 3 Wharton's Criminal Evidence, 11th Edit., p. 1960.

For similar reasons, an indictment is invalid if a defendant against whom a criminal information has been filed, is called by the prosecution as a witness before the grand jury to obtain evidence tending to sustain an indictment against him, which supersedes the earlier information. *Mulloney v. United States*, 1 Cir., 1935, 79 F.2d 566; *United States v. Miller, supra; United States v. Kimball*, CC., 117 F. 156. In neither situation is the defendant required to claim the privilege. The law grants him this protection. It is a right which he alone may waive. *Id.* at 677 (emphasis in original).

In the *Kimball* case the Court made reference to the ancient rule that a defendant could not testify for himself and stated:

The law of the state has removed the disability of a defendant in a criminal case to testify, and permits him to stand mute or to testify as he wills, and protects his choice from any suggestion of the prosecuting party, as well as unfavorable inference by the jury. No right of this nature springs from the constitution. Such a defendant could not, before the statute, be asked to take the witness stand, because, on account of his status, he could not be a witness voluntarily or compulsorily; and the disability now continues, unless of his own motion he elect to remove it. To demand or to request that he shall be sworn is an attempt to choose for him, which constrains his acceptance and coerces him to make public choice in the presence of the jury. This would be misconduct on the part of the prosecution, intended and calculated to harm the defendant, disturb his free

choice, and prejudice the jury in the case of declination. This protection relates solely to a defendant.

United States v. Kimball, 117 F. 156, 160 (C.C.S.D.N.Y.1902).

The Fifth Amendment to the United States Constitution reads: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury  . . . ." The function of the grand jury clearly terminates with the issuance of the indictment. It has no relationship to the trial itself. We find no constitutional, statutory or case authority for employment of the grand jury as a discovery instrument to help the government prepare evidence to convict an already indicted defendant. Such a use of the grand jury would pervert its constitutional and historic function. United States v. Lawn, 115 F.Supp. 674, 677 (S.D.N.Y.1953); Boone v. People, 148 Ill. 440, 448–50, 36 N.E. 99 (1894); State v. Clifford, 86 Iowa 550, 53 N.W. 299, 300 (1892). See also In re National Window Glass Workers, 287 F. 219, 227–28 (N.D. Ohio 1922); United States v. Kimball, 117 F. 156, 167 (1902).

The record in our instant appeal shows clearly that such an abuse of the grand jury process was undertaken by the United States Attorney. As noted above, appellant had been twice secretly indicted and was unwarned of those facts. Nonetheless, the United States Attorney undertook substantial questioning of appellant before the grand jury and without counsel present in the room [3] about the subject matter of the secret indictments.

In 1964 the Supreme Court said:

[U]nder our system of justice the most elemental concepts of due process of law contemplate that an indictment be followed by a trial, "in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law." 360 U.S., at 327 [79 S.Ct. at 1209, 3 L.Ed.2d 1265]

(STEWART, J., concurring). It was said that a Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding.

Massiah v. United States, 377 U.S. 201, 204, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964).

In 1977 the Supreme Court said:

Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him— "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, [406 U.S. 682], at 689, [92 S.Ct. at 1882]. See Powell v. Alabama, 287 U.S. 45, [53 S.Ct. 55, 77 L.Ed. 158]; Johnson v. Zerbst, 304 U.S. 458, [58 S.Ct. 1019, 82 L.Ed. 1461]; Hamilton v. Alabama, 368 U.S. 52, [82 S.Ct. 157, 7 L.Ed.2d 114]; Gideon v. Wainwright, [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799]; White v. Maryland, 373 U.S. 59, [83 S.Ct. 1050, 10 L.Ed.2d 193]; Massiah v. United States, 377 U.S. 201, [84 S.Ct. 1199, 12 L.Ed.2d 242]; United States v. Wade, 388 U.S. 218, [87 S.Ct. 1926, 18 L.Ed.2d 1149]; Gilbert v. California, 388 U.S. 263, [87 S.Ct. 1951, 18 L.Ed.2d 1178]; Coleman v. Alabama, [399 U.S. 1, 88 S.Ct. 2, 19 L.Ed.2d 22].

Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

Where a substantial purpose of calling an indicted defendant before a grand jury is to question him secretly and without counsel present without his being informed of the nature and cause of the accusation about a crime for which he stands already indicted, the proceeding is an abuse of process which violates both the right to counsel provision of the Sixth Amendment and the due process clause of the Fifth Amendment. Indict-

---

**3.** Our point, of course, is not that defense lawyers should be admitted to grand jury rooms, but rather that indicted defendants must not be subjected to questioning before grand juries about the offenses upon which they await trial.

ments for perjurious answers given in such a proceeding must be quashed because the proceeding itself is void.

Any other result in this case would allow the revival of a modern version of the ancient English Star Chamber where the accused was required to appear without counsel and answer any questions his prosecutors or judges might put. The abuses of the Star Chamber contributed to this nation's adoption of the Fifth Amendment's guarantee of a right to be free from self-incrimination, and the Sixth Amendment's guarantee of a right to counsel after the initiation of a criminal prosecution.

■ No such result, of course, would flow (absent facts not presented here) from calling a defendant indicted for one crime to appear and give evidence before a grand jury upon a wholly different and separable offense.

The dissent in this case recognizes that "the government may not in the absence of an intentional and knowing waiver call an indicted defendant before a grand jury and there interrogate him concerning the subject matter of a crime for which he stands already indicted." *United States v. Mandujano*, 425 U.S. 564, 594, [96 S.Ct. 1768, 1785, 48 L.Ed.2d 212] (1976) (Brennan, J., concurring). The dissent, however, would hold that such questioning would not offend the Constitution unless it was the "sole or dominant purpose of the grand jury."[4] If such a rule were applied to the present case, it would have required little added ingenuity on the part of the prosecutor to question the already indicted defendant extensively about a wholly separate crime and then turn to less extensive questioning on the crimes for which defendant was already indicted and about to be tried.

Such a rule would allow pretrying an indicted defendant in the secrecy of the grand jury room without counsel beside him. The government's advantage in seeking wide-ranging discovery through this mechanism would be very great. Even a defendant's invocation of the Fifth Amendment (as in this case on a selective basis) would tell the prosecutor when he had struck pay dirt for more detailed investigation before trial or cross-examination at trial.

The tremendous advantages which the prosecution could gain by subjecting an indicted defendant to such a private inquisition just before trial would make a fundamental change in the American constitutional system of adversarial trial as set forth in the Fifth and Sixth Amendments. Nor could such abuse be cured by the trial court's sustaining objections to grand jury evidence thus procured. As indicated above, the knowledge gained by the prosecutor from the defendant's own mouth as to sensitive areas and potential witnesses would be invaluable to him even if the prosecutor never tendered a line of grand jury testimony for admission at the subsequent trial.

The dissent also cites a series of cases[5] as if they were precedents for upholding the prosecutorial abuses revealed in this case. Actually, none of these cases involved the compelled grand jury questioning of a witness who did not know that he was being questioned about the subject matter of an indictment secretly issued against him.

---

**4.** *See* dictum in *United States v. George*, 444 F.2d 310, 314 (6th Cir. 1971).

**5.** *U.S. v. Woods*, 544 F.2d 242 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *U.S. v. Sellaro*, 514 F.2d 114 (8th Cir. 1973), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *U.S. v. Braasch*, 505 F.2d 139, 147 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972); *U.S. v. Doe (Application of Ellsberg)*, 455 F.2d 1270 (1st Cir. 1972); *U.S. v. Dardi*, 330 F.2d 316, 336 (2d Cir.), *cert. denied*, 379 U.S. 845, 85 S.Ct. 50, 51, 13 L.Ed.2d 50 (1964); *In re Pilliteri*, 420 F.Supp. 913 (W.D.Pa. 1976); *U.S. v. Kovaleski*, 406 F.Supp. 267, 269 (E.D.Mich.1976); *In re Grand Jury Investigation*, 32 F.R.D. 175 (S.D.N.Y.), *appeal dismissed*, 318 F.2d 533 (2d Cir.), *cert. denied*, 375 U.S. 802, 84 S.Ct. 25, 11 L.Ed.2d 37 (1963); *U.S. v. Pack*, 150 F.Supp. 262 (D.Del.1957); *Application of Iaconi*, 120 F.Supp. 589, 591 (D.Mass.1954); *Application of Texas Co.*, 27 F.Supp. 847 (E.D.Ill.1939). *Compare* 8 J. Moore, Federal Practice ¶ 6.04, at 6–69 (2d ed. rev.1976) (cited by the dissent) *with id.* at 6–71.

Indeed the dominant purpose rule set forth by the dissent's cases cited in footnote 5 relates solely to claims of abuse by questioning potential trial *witnesses* and not to the questioning of an indicted defendant or defendants.

Only one case cited by the dissent involved questioning an indicted defendant before a grand jury. In that case, *United States v. George*, 444 F.2d 310 (6th Cir. 1971), George knew that he had been indicted and what he had been indicted for. The court found that he was to be questioned on "new matters" and not the subjects of his indictment. George also knew that he had been promised immunity from prosecution for any incriminating testimony he gave. George was convicted for contempt for refusing to answer any question at all. The *George* case is a far cry from our instant problem.

Indeed the dearth of precedent for our instant case is probably due to the fact that most prosecutors would readily perceive that the practice undertaken here was fundamentally repugnant to the American system of justice.

We recognize the strength and unanimity with which the Supreme Court has decreed that Fifth Amendment abuses in grand jury proceedings do not warrant condonation of perjury or prevent sanctions for false statements. *United States v. Mandujano, supra,* 425 U.S. at 576–77, 96 S.Ct. 1768; *United States v. Wong, supra. See also United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); *Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *Kay v. United States,* 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938); *United States v. Kapp,* 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205 (1937). But the prosecutorial abuse in this case appears to us to have involved employment of a grand jury completely beyond its jurisdiction.

There is a distinction of great moment between grand jury questioning of a witness (even one who might subsequently be indicted) and grand jury questioning of an indicted defendant on the subject of the crime with which he is charged. The importance of the beginning of a criminal prosecution was emphasized by Mr. Justice Stewart in his opinion in *Kirby v. Illinois,* 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), as follows:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.[7] See *Powell v. Alabama,* 287 U.S., at

> [7] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S.Const., Amdt. VI.

> 66–71 [53 S.Ct., at 63]; *Massiah v. United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *Spano v. New York,* 360 U.S. 315, 324 [79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265] (DOUGLAS, J., concurring).

We believe that secret and compelled prosecutorial interrogation of an indicted defendant before a grand jury on the subject matter of the crime with which he is charged can destroy a defendant's right to subsequent fair trial.

We have held above that substantial grand jury questioning of a secretly indicted defendant on the subject of the indictment represents prosecutorial abuse which violates the due process clause of the Fifth

Amendment and the right to counsel provision of the Sixth Amendment, and that such a proceeding is void.

The judgments of conviction in these cases are reversed and remanded for vacation of the sentences and dismissal of the indictments.

## APPENDIX A

CASE No. 72–268

18 USC, § 1623

UNITED STATES OF AMERICA

v.

VINCENT MORAN DOSS

INDICTMENT

Filed December 13, 1972

THE GRAND JURY CHARGES:

### COUNT ONE

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

– – – – – VINCENT MORAN DOSS – – – – – having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empanelled and sitting in the Western District of Tennessee, on November 13, 1972 that he never had any business dealings with Paul E. Patterson, a material declaration, when in fact he purchased a controlled substance, 20,000 amphetamines, on or about November 6, 1971, from Paul E. Patterson and further that on October 13, 1972 VINCENT MORAN DOSS did purchase six containers of an agricultural chemical, Treflan from Paul E. Patterson at Covington, Tennessee, in violation of Title 18, United States Code, § 1623.

### COUNT TWO

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

– – – – – VINCENT MORAN DOSS – – – – – having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empanelled and sitting in the Western District of Tennessee, that on November 13, 1972, no one had ever offered him for sale two or three hundred guns which had been stolen from a Navajo Freight Lines truck, a material declaration, when in fact he attempted to assist Paul E. Patterson in purchasing those guns on or about October 13, 1972 in violation of Title 18, United States Code, § 1623.

### COUNT THREE

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

– – – – – VINCENT MORAN DOSS – – – – – having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empanelled and sitting in the Western District of Tennessee, that on November 13, 1972, he knew nothing about two or three hundred guns stolen from Navajo Freight Lines, a material declaration, when in fact he had discussed those guns with Paul E. Patterson during September and October 1972, in violation of Title 18, United States Code, § 1623.

### COUNT FOUR

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

– – – – – VINCENT MORAN DOSS – – – – – having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empanelled and sitting in the Western District of Tennessee, that on November 13, 1972, Paul E. Patterson had never offered him any counterfeit money for sale, a material declaration, when in fact in October, 1972, Paul E. Patterson had offered counterfeit money to him for sale in violation of Title 18, United States Code, § 1623.

## APPENDIX B

THE COURT: All right, Mr. Parrish, what is the position of the government on the objection.

MR. PARRISH: The position of the government is the same as to the Treflan as it was the other day.

As to the guns, we need to keep in focus exactly what the purpose is, and what the issue is for the jury to determine, and that is, whether or not Mr. Doss caused Mr. Patterson to possess the counterfeit money, and Mr. Patterson and Mr. Williamson to possess the narcotics or controlled substances at that time.

It is a matter of developing evidence to determine whether or not that thing happened, so the initial inquiry, as I explained before, was what about that debt you owe me long ago. And Mr. Doss basically responds that he doesn't have any money, if I had it I'd give it to you, I guess everybody owes it to you.

And then it goes into alternate ways to satisfy that debt, that recognized debt by Mr. Doss. That's when these other things come up about the Treflan.

Mr. Patterson suggested in substance that if you don't have the money what else can we work out so you can satisfy that debt, and Mr. Doss suggests slot machines after Mr. Patterson mentioned juke boxes, and then they continue talking about what else, what other kind of things, and in that context Mr. Patterson says remember last year you were talking to me about those guns. And Mr. Doss acknowledges yes, sir, I remember, and Patterson says well what about them now, can we use that to satisfy this debt as a result of the dope, and they continue the discussion.

THE COURT: Well, now, is last year before the debt or after the alleged debt was occurred? That's the reason I asked the date of this October '72?

MR. PARRISH: I don't know when this mention was made by Mr.—well, okay, it would have had to have been after the pills, the situation on the pills, because Mr. Patterson met Mr. Doss for the first time by the introduction of Mr. Jamison, and all the relationship between Mr. Doss and Mr. Patterson was after that point in time, that being the fall of 1971, and it was November of 1971 when Mr. Williamson was arrested in Atlanta. So all of their conversation had to have occurred since then.

Now, Mr. Patterson is calling, in this instance we are talking about October of 1972, and it is Mr. Patterson mentions you know them guns you mentioned to me last year. So it would have been some point in time subsequent to the initial sale of the pills to Mr. Doss. That's the best I can do so far as time frame. And Mr. Doss says yes, sir, I remember. And Mr. Patterson says well that's something I could use, that's how we can settle this whole thing, can you get those guns. And Mr. Doss says I will check on that for you, and in a subsequent conversation Mr. Patterson asked did you check on those things and Mr. Doss responds that I haven't had a chance to get in touch with them. And on a subsequent occasion he is asked again and Mr. Doss says no I haven't, there is some trouble over there, and I haven't checked on them.

There is a meeting in Covington that was not transcribed, but Mr. Foushee was there, and Mr. Doss indicated at that meeting that the guns were at Fort Leonard Wood, but there was a dispute over there and he says they can't get the guns.

\*　\*　\*　\*　\*　\*

All of this centers around the term, how are we going to satisfy the debt as a result of my supplying the pills at your request.

A lot of this was brought up initially through the testimony elicited by the cross-examination of Mr. Andrews of Mr. Stevenson. Mr. Andrews inquired at length about these things and Mr. Stevenson told about the guns in his testimony, and those were matters not covered by direct examination.

I remember making an effort not to, and Mr. Andrews brought them up on cross-examination, and they have been injected into the lawsuit by Mr. Andrews' cross-examination of Mr. Stevenson, and I think if for no

other reason there should be a further explanation of them. There is an overriding consideration about all of the conversation, there was a relationship between Mr. Doss and Mr. Patterson, and the type relationship that they had, and how that relationship would have accommodated what is alleged in the indictment. And this whole nature and context of the conversations just solidifies the type relationship they had, and if there was nothing more the jury could rightfully conclude that if these two men had that type relationship it is implied that that relationship included what is alleged in the indictment.

\* \* \* \* \* \*

MR. PARRISH: The central question this jury has to determine is whether or not there was any indebtedness, and any obligation from Mr. Doss to Mr. Patterson as a result of this transaction involving the pills. That's something they are going to have to determine one way or the other.

Then, in the context of all this conversation comes up and it is in that context, but it is Mr. Doss acknowledging orally the debt, and then he doesn't have the money, and then it is Mr. Patterson that says what else is going on. And then all the other things come up in that context about satisfying that obligation.

\* \* \* \* \* \*

THE COURT: All right. The Court has listened to the argument of counsel in the objections made to the contents of the tapes, and the presentation of them to the jury.

The Court overrules the objections, and in doing so makes this observation.

That the contents of the tapes, based on what counsel have contended they say, goes to the relationship between Mr. Doss and Mr. Patterson. There is other proof to indicate, or there will be proof offered to indicate that Mr. Doss did have a relationship with Mr. Patterson that dealt in criminal enterprises within the scope of the two counts that will be submitted to the jury.

Now, it is also been indicated that Mr. Doss takes the position that he is a man of respectability, and he wouldn't deal in these things. That has been stated to the jury. There is such strong proof that he did deal in these matters, that the Court believes that the Government should be allowed to show the relationship, and the fact that Mr. Doss did discuss and did deal in dope and counterfeit money.

Now, even one against whom there is strong proof that deals in dope and counterfeit money is indicted you have the issue determined on those crimes and not on prejudicial matters. So the Court has been most concerned about whether or not this type testimony would be received by the jury as one who deals in a truck load of stolen Treflan would deal in dope and counterfeit money, or one who deals in guns would deal in dope and would deal in counterfeit money.

These questions of prejudice are very hard for a Court to determine, particularly until all the proof is in.

Up to this point there is a very strong case against Mr. Doss on the crimes charged, and we haven't heard his proof, we haven't heard all the government's proof, but his attitude, that he was shocked by some of these things, is just not borne out by the proof, and it could very well be argued that he commonly dealt in these things, and he was available for any sort of crime.

But I'm going to impose a condition on my ruling, and Mr. Parrish should be armed with this.

I believe he understands this, but in case he doesn't the Court imposes, whether you want to call it a protective order or what, and directs that Mr. Parrish should be very careful in any argument, not to argue to the jury any remarks that would constitute an inference that anybody who deals in guns and stolen Treflan would deal in controlled substances or counterfeit money.

Now, I'm partially persuaded in my ruling that there is proof that Mr. Doss dealt with Mr. Patterson on a credit basis, and expected to get the money from Mr. Williamson that he was going to get in Atlanta and pay Mr. Patterson. And when Mr.

Williamson got arrested then the source of his money was not available, and Mr. Patterson was out the black mollies, and this is a very plausible theory in the light of the proof.

So I can't eliminate all references to this but, Mr. Parrish, the Court is concerned about this, and would not expect you to refer to Mr. Doss' likelihood of committing these crimes because he was willing to or did deal in what appeared to be stolen Treflan or guns.

I think the less said about this the better in the closing argument.

MR. PARRISH: I agree.

THE COURT: I will reserve my thoughts and determination on a cautionary instruction, and counsel may make a note and if you want one offered or suggest one I will be glad to receive it. I'm not transferring all the responsibility for that to counsel, but sometimes counsel don't want a cautionary instruction that is intended to be in their behalf.

\* \* \* \* \* \*

WEICK, Circuit Judge, joined by Circuit Judge ENGEL, dissenting.

The Court has embarked upon a novel and unchartered venture which is fraught with dire and far-reaching consequences. The decision is unsupported by precedent or authority. It conflicts with the prior decisions not only of this Court but also of the Supreme Court of the United States.[1] As shown below, it undermines the broad investigatory powers which historically have been possessed by grand juries. In the present case it allows a convicted perjurer with a long criminal record to go free on two perjury charges. I respectfully dissent. I would affirm the judgment of conviction entered by the District Court on Counts III and IV of the indictment.

On October 10, 1972 appellant Vincent Moran Doss was charged in two sealed indictments by a federal grand jury in the Western District of Tennessee. One indict-

ment charged Doss with causing Paul Patterson and Nolan Ray Williamson to possess, with intent to distribute, approximately 20,000 amphetamines in November, 1971, in violation of 21 U.S.C. § 841(a). The other sealed indictment charged Doss with *causing Paul Patterson to possess* fifty counterfeit twenty dollar bills in *January, 1972*, in violation of 18 U.S.C. § 472.

Patterson had been cooperating with federal authorities since April or May, 1972, and he subsequently assisted the Government in its investigation of Doss. Patterson learned that Doss was involved in other criminal activities involving additional counterfeit currency, a stolen agricultural chemical Treflan, 300 stolen Browning automatic weapons, and other stolen property. None of these matters was included in the two sealed indictments, because they took place subsequent to the offenses charged therein.

On October 4, 1972 Patterson and Doss, in a telephone conversation, spoke about counterfeit money and Browning automatic weapons. On October 9, 1972 Patterson and Doss discussed trading the Browning guns for the chemical Treflan. A similar telephone conversation took place on October 12, 1972.

On October 13, 1972 Patterson, Doss, and a Government agent discussed a possible exchange of the chemical Treflan to Doss for a truckload of 300 stolen Browning automatic weapons.

On *October 16, 1972* Patterson told Doss that *he (Patterson) could sell some counterfeit money to Doss.*

On November 7, 1972 a Government agent overheard Patterson and Doss discuss Browning automatic weapons and counterfeit money.

On November 13, 1972 Doss appeared before the same grand jury, which one month earlier had returned the sealed indictments against him, to answer questions concerning his subsequent criminal activities. Doss was given comprehensive warnings; he was

---

1. *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *United States v. Wong,* 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *United States v. Mandu-* jano, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *United States v. Lazaros,* 480 F.2d 174 (6th Cir. 1973); and *United States v. George,* 444 F.2d 310, 314 (6th Cir. 1971).

informed that he was a "target" defendant of a criminal investigation; he was told that he had a right to confer with his own attorney outside the grand jury room, and was advised of his right to remain silent; however, he was not told of the existence of the two sealed indictments which related to his past activities.

During his testimony before the grand jury Doss was excused nine times to consult with his retained attorney. After eight of his nine consultations Doss invoked his Fifth Amendment right against self-incrimination. The Assistant United States Attorney, Larry Parrish, asked Doss the following pertinent questions before the grand jury:

Q Has anybody ever attempted or offered to you for sale a large amount, a large number of Browning shotguns which were stolen?

A No, sir.

Q Including two or three hundred guns?

A No, sir, offer to me for sale, no.

Q Has anybody in any way, ever informed you about any guns like that?

A That quantity of guns?

Q Yes.

A I don't think so, no.

Q Guns that were taken from a Navaho [sic] truck?

A No.

Q You know nothing about anything like that?

A No, sir.

Q You wouldn't know who has possession of them right now?

A No, sir.

Mr. Parrish later asked Doss:

Q Has Paul E. Patterson ever tried to sell you any counterfeit money?

A No, sir, or if he did, I don't know anything about it.

This testimony before the grand jury formed the basis for Counts III and IV of a four-count perjury indictment returned against Doss on December 11, 1972. Count III related to Doss' answers during the grand jury proceeding concerning stolen guns, and Count IV charged Doss with testifying falsely with respect to his answers about counterfeit money.[2]

On March 26, 1973 Doss' attorney filed a motion to suppress grand jury testimony and to dismiss the perjury indictment. The District Court dismissed Count I of the indictment but overruled the motion to dismiss on Counts II, III, and IV.

On February 11, 1974 a jury trial was held on the remaining three counts of the perjury indictment. After the conclusion of all the evidence District Court Judge Robert M. McRae made the following comments from the bench with respect to Count IV and with respect to Counts II and III:

Now, he had already been indicted on one counterfeit charge, but that was not pertaining to any sale of counterfeit money, it was counterfeit—a charge based on counterfeit money Mr. Doss had allegedly given to Mr. Patterson and caused him to transport it through this district.

With regard to the two counts pertaining to those guns stolen from the Navajo

2. Count III provided as follows:

COUNT THREE

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

- - - - - VINCENT MORAN DOSS - - - - - -

having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empaneled and sitting in the Western District of Tennessee, that on November 13, 1972, he knew nothing about two or three hundred guns stolen from Navajo Freight Lines, a material declaration when in fact he had discussed those guns with Paul E. Patterson during September and October 1972, in violation of Title 18, United States Code, § 1623.

Count IV provided as follows:

COUNT FOUR

On or about November 13, 1972, in the Western District of Tennessee, Western Division,

- - - - - VINCENT MORAN DOSS - - - - - -

having been duly administered an oath to tell the truth, knowingly testified falsely before the United States Grand Jury empaneled and sitting in the Western District of Tennessee, that on November 13, 1972, Paul E. Patterson had never offered him any counterfeit money for sale, a material declaration, when in fact in October, 1972, Paul E. Patterson had offered counterfeit money to him for sale in violation of Title 18, United States Code, § 1623.

Freight Line, that was an on-going investigation that the Grand Jury in this district had not returned any indictments, and was an appropriate matter for investigation.

The jury acquitted Doss on Count II, but returned a verdict of guilty as to Counts III and IV.

Doss was sentenced on February 15, 1974 to three years' confinement on each count. The sentences ran concurrent with each other and with other longer sentences imposed on Doss stemming from other convictions.[3] He appealed his conviction on the perjury counts to this Court, which appeal was heard by a three-Judge panel of this Court on October 13, 1975.

On November 18, 1976 a two-Judge panel of this Court, consisting of Judges Edwards and McCree,[4] in United States v. Doss, 545 F.2d 548 (6th Cir. 1976), in an opinion written for the panel by Judge Edwards, reversed Doss' conviction on both perjury counts but left open the question as to "what result would flow from calling a defendant indicted for one crime to appear and give evidence before a grand jury upon a wholly different and separable offense." Id. at 552 n. 1.

On December 16, 1976 the Government filed a petition for rehearing with suggestion for rehearing en banc. On December 27, 1976 the suggestion was granted.

On April 12, 1976 the petition for rehearing was considered en banc on the briefs but without oral argument.

3. Doss had also been indicted by the federal grand jury for the Western District of Tennessee at least twice on other charges.

On November 13, 1972, the same day that Doss had appeared before the grand jury proceeding in which he perjured himself, Doss was indicted for transporting stolen goods in interstate commerce. On January 31, 1974 he was found guilty on this charge.

On October 9, 1973 Doss was indicted on three other counts. One count related to obstruction of justice, another related to an offer to bribe a witness in a federal trial in order to influence her testimony, and the third count related to conspiracy to do the same. On January 17, 1974 Doss was convicted on all three counts.

## I

The Court, in its majority opinion en banc, written by Judge Edwards, holds that where a substantial purpose of calling an indicted defendant before a grand jury is to question him secretly and without counsel and without informing him that he is the subject of a sealed indictment, such grand jury proceeding is in violation of the Fifth and Sixth Amendments. The Court further holds that where the accused is substantially questioned about the subject matter of the sealed indictments, any subsequent indictments for perjurious answers given in such proceeding must be quashed because the proceeding itself is absolutely void for lack of jurisdiction, relying on Brown v. United States, 245 F.2d 549 (8th Cir. 1957).

The Court, however, adds a crucial caveat:

No such result, of course, would flow (absent facts not presented here) from calling a defendant indicted for one crime to appear and give evidence before a grand jury upon a wholly different and separable offense.

In light of the above caveat, the incongruity between the reasoning in the majority opinion and its end result is self-evident. The Court reverses the convictions on both of the perjury counts, Counts III and IV. By the two-Judge panel's own concession in its opinion reported in 545 F.2d at 550, Count III involved testimony before the grand jury on an entirely different and unrelated offense from that for which Doss

Doss was sentenced on February 15, 1974, to five years' imprisonment on his conviction for transporting stolen goods. This sentence ran concurrently with a five year sentence imposed on October 5, 1973 on another unrelated conviction. On the same day he was given concurrent sentences of five years' imprisonment on each count of his three-count obstruction of justice conviction. These sentences ran consecutively with the transportation of stolen goods conviction and his five year October 5, 1973 sentence.

4. Judge William E. Miller had been the third member of this panel, but his death occurred more than six months before the panel's opinion in this case was announced, and he did not participate in the decision.

had been secretly indicted. The panel so stated:

. . . [T]he question addressed to Doss which the jury found he answered falsely under Count III of the indictment

was totally unrelated to the offenses for which he had been indicted.[5] (Footnote added)

The incongruous effect of this Court's decision is manifest in light of the facts of

**5.** This admission by the two-Judge panel effectively conceded the propriety of Doss' conviction under Count III; because the sentences on Counts III and IV run concurrently, application of the concurrent sentence rule would obviate the necessity to consider Doss' arguments on Count IV. *Barnes v. United States*, 412 U.S. 837, 848 n. 16, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Romano*, 382 U.S. 136, 138, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976); and *Ethridge v. United States*, 494 F.2d 351 (6th Cir.), *cert. denied*, 419 U.S. 1025, 95 S.Ct. 504, 42 L.Ed.2d 300 (1974).

The majority opinion, however, by sua sponte resort to evidence not part of the record in the present appeal, indicates that the concession of the panel "may" not be correct. We think the concession was correct and that it may not properly be questioned by resort to evidence dehors the record, in violation of Fed. R.App.P. 10(a), as the Court has done by footnote 2 of the majority opinion, which reads in part as follows:

The two secret indictments, one for causing Nolan Ray Williamson and Paul E. Patterson to possess with intent to distribute 20,000 amphetamine capsules, and the other for causing Paul E. Patterson to possess and transport $1,000 of counterfeit currency, were tried at the same time. We take judicial notice of the Joint Appendix in these cases. It is a part of this court's record in relation to appeals of guilty verdicts in the joint trials in *United States v. Doss*, No. 74–1722 and No. 74–1723, affirmed January 9, 1976, by unpublished per curiam.

The majority opinion is replete with many pages of testimony copied from the Joint Appendix in the case of *United States v. Doss*, which involved the trial of Doss on the two secret indictments and his conviction which was affirmed by this Court on January 9, 1976 in cases Nos. 74–1722 and 74–1723.

The taking of judicial notice sua sponte by an appellate court in its judgment, and without notice to the parties and without giving them an opportunity to be heard, was in violation of Fed.R.Evid. § 201(e). See also 21 Federal Practice and Procedure, Wright & Graham, § 5110 p. 527 (1977); American Law Institute, Model Code of Evidence, Rule 806(4) and Rule 804(1) and Comments.

No pretense has been made that any notice was ever given to the parties or their attorneys that the Court of Appeals was going to take judicial notice, and they have not had any opportunity to be heard. No judicial notice of anything was taken by the two-Judge panel which initially decided the appeal. The appeal had been pending for more than two years before this Court, by its judgment, without hearing or notice, took judicial notice.

Fundamental fairness, as well as due process, requires that such notice should have been given and a hearing provided. *United States v. Damato*, 554 F.2d 1371, 1373, 1374 fn. 9, 10 (5th Cir. 1977).

None of the cases relied upon by the majority in footnote 2 held that judicial notice could be taken of outside evidence or records without notice to the parties and an opportunity to be heard. In four of the cases, namely, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 157, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *New York Indians v. United States*, 170 U.S. 1, 32, 18 S.Ct. 531, 42 L.Ed. 927 (1893); *International Bhd. of Teamsters v. Zantop Air Transport Corp.*, 394 F.2d 36, 40 (6th Cir. 1968); and *Paul v. Dade County*, 419 F.2d 10, 12 (5th Cir. 1969), *cert. denied*, 397 U.S. 1065, 90 S.Ct. 1504, 25 L.Ed.2d 686 (1970), the parties were given the opportunity to and did argue the question whether the court should take judicial notice of certain records outside of the record of their appeal. Where an Appellate Court desires sua sponte, to augment the record by new evidence, not offered in the trial court, the parties should be afforded a hearing on whether judicial notice should be taken, an opportunity to examine the new evidence and comment thereon and to offer any new evidence to rebut the same.

The grand jury proceeding which is the subject of the present appeal took place on November 13, 1972. It was not until September 24, 1973 however, that the trial commenced in the District Court on the two sealed indictments against Doss resulting in his convictions on October 5, 1973.

The majority has taken judicial notice of testimony contained in the Joint Appendix filed in this Court in the appeals from the convictions of Doss under the two sealed indictments and copied many pages therefrom in the majority opinion. No doubt the purpose was an endeavor to show by extraneous new evidence improper questions propounded to Doss and the use of two grand jury proceedings to obtain evidence to assist the prosecution in the trial of Doss under the two sealed indictments.

this case, *i. e.*, where a defendant is questioned at any time in a grand jury proceeding about an offense for which he stands indicted, all subsequent indictments for perjurious answers given in such proceeding must be quashed even if any or all of the perjury indictments concern testimony about a wholly different, unrelated and separable offense, and even if the main or substantial purpose of the grand jury proceeding, as here, is to question the defendant about matters unrelated to the subjects of the sealed indictments.

The incongruity does not end here, however. The majority also holds:

Where a substantial purpose of calling an indicted defendant before a grand jury is to question him secretly and without counsel present without his being informed of the nature and cause of the accusation about a crime for which he stands already indicted, the proceeding is an abuse of process which violates both the right to counsel provision of the Sixth Amendment and the due process clause of the Fifth Amendment. Indictments for perjurious answers given in such a proceeding must be quashed because the proceeding itself is void.

The effect of this holding is that where an indicted defendant is brought before the grand jury without counsel present with him in the grand jury room,[6] and he is not informed of the nature of the offenses for which he has been secretly indicted, the grand jury proceeding is ipso facto void;

and, given a literal reading of the above holding, the majority apparently holds that even where the defendant is questioned solely on matters wholly unrelated to the sealed indictment, the defendant must nevertheless first be informed that he is the subject of a sealed indictment; otherwise the defendant is free to perjure himself.

Finally, the Court's reasoning with respect to Count IV of the perjury indictment is wholly without basis in fact. The Court actually concedes that the counterfeit offense about which Doss was questioned in the grand jury proceeding, and which formed the basis of Count IV of the perjury indictment, "might be regarded as a totally different transaction" from the counterfeit offense in the sealed indictment. In fact the opinion of the two-Judge panel in *United States v. Doss*, 545 F.2d 548, 549 (6th Cir. 1976), contains the following:

The question pertaining to counterfeit and the answer which appellant gave is as follows:

Q. Has Paul E. Patterson ever tried to sell you any counterfeit money?

A. No, sir, or if he did, I don't know anything about it.

Analysis of the details of this case shows that the counterfeit offense as to which appellant was previously indicted pertained to appellant's furnishing Patterson with $1,000 of counterfeit in January of 1972. On the other hand, the question and answer now alleged to be perjurious

---

The Per Curiam opinion of this Court in the appeals from the conviction of Doss on the two sealed indictments reveals however, that no issue was ever raised in those cases over the conduct of or the propriety of the grand jury proceeding.

Other grounds of error were relied upon exclusively and we held in a per curiam opinion, that no prejudicial error occurred in his trial and convictions, and we affirmed the judgments of conviction. It has become final and constitutes res adjudicata of all issues adjudicated therein. *United States v. Doss*, Nos. 74–1722–23 6th Cir., decided Jan. 9, 1976. We are therefore at a loss to know the purpose of the majorities' reliance on the evidence contained in the joint appendix since it had no bearing on either the trial of Doss on the sealed indictments or on his perjury convictions.

If changes are desirable to be made in the historic procedures of grand juries, this should be the function of Congress and not of appellate courts.

We ought not to condone perjury before a Grand Jury.

**6.** Doss did have benefit of counsel, but his counsel was present outside the grand jury room. Therefore, the majority's reference to "without counsel present" must mean that the majority is now advancing the requirement that counsel must be present *in* the grand jury room where a substantial purpose of the grand jury proceeding is to question the defendant "secretly" and where he is not informed that he is already under indictment.

appear to pertain to Patterson's testimony that he offered appellant counterfeit in October of 1972. The discrepancy in dates and the reversal of roles of the parties might create doubt that any answer to the question posed to appellant could have been used in any way in the government's case under the then pending indictment.

These were two completely different and separate offenses, involving different and separate acts, *i. e.* one which occurred in January, 1972 and another which occurred some ten months later, in October, 1972. Moreover, in January, 1972 it was *Doss* who *furnished* Patterson with counterfeit money, whereas in October, 1972 it was *Patterson* who *offered* counterfeit money to Doss.

In fact, District Judge McRae in his comments from the bench quoted above, and the Government in its briefs to this Court, recognized these very distinctions. Counsel for the Government was clearly within his rights, in fact it was his duty, to question Doss about any counterfeiting incidents which took place subsequent to the initial counterfeiting offense that was the subject of one of the secret indictments.

Furthermore, from my examination of the record on this appeal, there was no evidence, contrary to the majority's assertion, that the counterfeit money which Doss furnished to Patterson in January, 1972 "consisted in part" of the same counterfeit money that Patterson offered to furnish to Doss in October, 1972.

The Court further makes the wholly unwarranted and unsubstantiated statement that "the government was employing the grand jury testimony of the secretly indicted witness [Doss] for the substantial purpose of preparing testimony against him," whereas in fact nowhere in the grand jury transcript did the Government inquire into the subject matter of the sealed counterfeit indictment, *i. e.* Doss' furnishing counterfeit money to Paul Patterson in January, 1972. The 28-page grand jury transcript consisted of approximately 672 lines of questions and answers and approximately 150 questions propounded to Doss. Excluding the one,

two-line, question propounded to Doss about Patterson's offer in October, 1972 to furnish to Doss counterfeit money, there were only three questions, or 2% of all of the questions propounded, (consisting of a total of only four lines) which dealt with counterfeit money; and *none* of these questions, I submit, can plausibly be characterized as constituting the preparation of testimony against Doss. *See United States v. Mandujano*, 425 U.S. 564, 609, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), (Stewart, J., concurring). Each of these three questions referred to Doss' alleged dealings in counterfeit money *not* with Patterson, but rather, specifically with other named individuals: Gary Lily (p. 10, lines 21–22); Gene Reeves (p. 23, line 15); and Kenny Day and Jim Aaron (p. 26, line 5).

Only one question might even remotely be construed broadly enough to involve the counterfeit indictment. Doss was asked, "Do you have any business dealings with Mr. Patterson, or is it just a personal relationship?" It is doubtful that this query was aimed at the counterfeit transaction in January because of its generality and use of the present tense (p. 9, lines 15–16). In any event, the question was altogether innocuous since in response, Doss raised his Fifth Amendment privilege after consulting his attorney, and did not answer the question.

Thus it is clear that the Government attorney did not undertake "substantial" questioning of Doss relating to Doss' furnishing Patterson with counterfeit money in January, 1972; rather the facts establish that no question can be reasonably interpreted as concerning the subject matter of that secret indictment.

The majority also states that "the government deliberately and purposely employed the grand jury in questioning" Doss about the narcotics charge upon which he was already secretly indicted. I presume that this observation was intended to support the majority's conclusion that the prosecutor had undertaken "substantial questioning of appellant . . . about the subject matter of the secret indictments." As mentioned above, this particular indict-

ment alleged that Doss had furnished Patterson and Nolan Ray Williamson with a large quantity of amphetamines in November, 1971. Contrary to the majority I find no questions which directly concern the supplying of any amphetamines. Rather, at one point Doss was asked if Williamson had attempted to sell him stolen agricultural chemicals. Only one question could have indirectly implicated the 1971 amphetamine deal. Doss was asked, "Did you ever have any business dealings with him (Williamson)?" (p. 21, line 12). Again Doss relied on his Fifth Amendment privilege, after consulting his attorney, and did not answer the question. As the majority correctly noted, Doss' answers to these inquiries were not made a basis for a perjury count. Even if this broad question was arguably related to the secret narcotics indictment, it does not affect my conclusion that a substantial (much less a predominate) motive of the entire proceedings was not to inquire into the offenses already under indictment.

Also, even if the grand jury questions pertaining to counterfeit money were somehow arguably related to the pending sealed counterfeit indictment (with which proposition I do not agree), the Court's reversal of the perjury conviction on Count III is completely unsupported by law.

Furthermore, I have been unable to find any case which goes so far as to hold that a grand jury's jurisdiction to inquire into offenses unrelated to the subject of pending indictments is vitiated *ab initio* once several questions are propounded which arguably might relate to the pending indictments.

It would seem to me that even if the prosecutor in investigating a number of crimes strays slightly into forbidden territory and asks a few questions of a witness who is appearing before the grand jury, which questions were objectionable because the subject matter was embraced in a pending indictment, an adequate remedy exists to exclude such evidence upon the trial of the pending indictment. It is certainly not necessary to declare the entire grand jury proceeding as null and void for lack of jurisdiction; it certainly does not license a witness to commit perjury.

The Court relies on three cases for its holding: *Brown v. United States*, 245 F.2d 549 (8th Cir. 1957); *United States v. Lawn*, 115 F.Supp. 674 (S.D.N.Y.1953); and *United States v. Kimball*, 117 F. 156 (C.C.S.D.N.Y. 1902).

The Court's reliance on *Brown* is misplaced. The facts in *Brown* were considered in our decision in *United States v. Lazaros*, 480 F.2d 174, 178 n. 6 (6th Cir. 1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1409, 39 L.Ed.2d 468 (1974), as follows:

In that case the defendant was convicted of perjury based on testimony before a grand jury sitting in Nebraska. The testimony was given in regard to activity that occurred in St. Louis, Missouri. There was no connection between any of the alleged criminal activity and Nebraska, other than the fact that the grand jury happened to be sitting there. The Eighth Circuit held that the Nebraska grand jury had no jurisdiction to investigate criminal conduct occurring in Missouri, and consequently, the testimony before the grand jury could not be used to support a perjury conviction.

*See also United States v. Mandujano*, 425 U.S. 564, 582–3 n. 8, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), (Burger, C. J., plurality opinion).

This Court in *Lazaros* determined that *Brown* was inapposite to the factual situation in *Lazaros*. This Court stated:

This is obviously not the case here. The grand jury was investigating bribery that had occurred primarily within the jurisdiction in which the grand jury was sitting. The perjurious testimony related to incidents that occurred within that jurisdiction. The grand jury had both subject matter and territorial jurisdiction over the matters to which the perjurious testimony pertains. (*Id.* at 178 n. 6)

As in *Lazaros*, the grand jury in the present case was "conducting a legitimate investigation into crimes which had in fact taken place within its jurisdiction." *United States v. Chevoor*, 526 F.2d 178, 185 (1st Cir. 1975), *cert. denied*, 425 U.S. 935, 96

S.Ct. 1665, 48 L.Ed.2d 176 (1976). *See also United States v. Cuevas*, 510 F.2d 848, 852 (2d Cir. 1975).

Unlike the Nebraska grand jury in *Brown*, which was without jurisdiction from the outset of the proceedings, the grand jury in the present case was clearly within its jurisdictional authority to question Doss about matters unrelated to the offenses for which he already stood secretly indicted. Even if certain questions during the proceeding related to the subject matter of the secret indictments (which I deny), that incident did not strip the grand jury of its already-acquired jurisdiction.

*Brown* is further distinguishable from the present case in that the Nebraska grand jury in that case caused the defendant to be brought before it solely for the purpose of "extracting testimony from him with a view to prosecuting him for perjury . .." *Masinia v. United States*, 296 F.2d 871, 875 (8th Cir. 1961). The Court in *Brown* stated at 555:

The purpose to get him indicted for perjury and nothing else is manifest beyond all reasonable doubt.

Again, such was not the case here. *See LaRocca v. United States*, 337 F.2d 39, 42–43 (8th Cir. 1964).

Contrary to the implication in the majority opinion there is no evidence that the main or substantial purpose of the grand jury proceeding was to question Doss about the offenses which were the subject of the sealed indictment, or to get Doss indicted for perjury; nor does the grand jury transcript show that the Government attorney "undertook substantial questioning" of Doss "about the subject matter of the secret indictments." The record is replete with documentation of the fact that Doss was the subject of numerous criminal investigations substantially unrelated to the charges in the sealed counterfeiting indictment. During the grand jury proceeding Doss was questioned about various illegal activities such as stolen Browning automatic weapons, stolen agricultural chemicals, and other assorted stolen merchandise, such as saddles, tractors, automobiles, handguns, and cameras.

As already noted, the questions propounded to Doss relating to counterfeit money constituted only a minute portion of the entire grand jury proceeding. Moreover, the question concerning counterfeit money, and Doss' answer thereto, which formed the basis of Count IV of the perjury indictment, was unrelated to the counterfeit offense for which Doss was under sealed indictment. As the Court notes, the grand jury question pertained to Patterson's offering Doss counterfeit money in October, 1972, whereas the counterfeit offense for which Doss was under sealed indictment pertained to Doss' furnishing Patterson with counterfeit money in January, 1972.

The fact that the grand jury questions regarding counterfeit money were unrelated to the sealed indictment and the fact that the questions concerning counterfeit money constituted only a very small part of the grand jury proceeding, are further proof that the main or substantial purpose of the grand jury proceeding was not to question Doss about the offenses for which he was secretly indicted, and was not, as in *Brown, supra*, for the sole "purpose to get him indicted for perjury."

The Court's quotations from *United States v. Lawn, supra*, and *United States v. Kimball, supra*, are merely accurate for the propositions stated, but they do not support the majority's ultimate holding reversing Doss' perjury convictions under Counts III and IV. The *Lawn* case prohibits the Government from questioning an indicted defendant in a grand jury proceeding about the offense charged in the pending indictment, unless the defendant waives his Fifth Amendment right against self-incrimination. The *Kimball* case merely refers to a provision in the New York State Code of Criminal Procedure which addressed the issue of compelling a defendant to testify before a grand jury. Neither of these cases held that a grand jury's jurisdiction was vitiated *ab initio* once an inquiry (into offenses unrelated to charges for which the defendant already stood indicted) briefly

touched upon a matter only arguably related to the pending indictment. Rather, a grand jury has jurisdiction to investigate possible criminal violations where an indictment has yet to be returned. The courts cannot limit a legitimate grand jury investigation of alleged criminal violations. *Branzburg v. Hayes*, 408 U.S. 665, 700–01, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). A presumption of regularity attaches to a grand jury's proceeding, *United States v. Woods*, 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), and such regularity has not been sufficiently rebutted herein.

## II

The effect of the Court's ruling severely handicaps the grand jury's function as a body investigating crimes. The investigatory role of the grand jury has been fully developed by the Supreme Court.

As noted by the Court in *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956):

> The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes.

In the United States "the grand jury has the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Branzburg v. Hayes*, 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972). *Cf. United States v. Lazaros*, 480 F.2d 174, 177–78 (6th Cir. 1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1409, 39 L.Ed.2d 468 (1974).

In this manner the grand jury wields the sword of accusation against persons who the grand jurors have probable cause to believe are involved in criminal activity, and shields the innocent against oppressive prosecution. It determines "whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962).

The grand jury conducts "a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).

Rather, "[t]he grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *United States v. Calandra*, 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974).

The Court in *Calandra* quoted at length from *Branzburg v. Hayes, supra*, on the importance of the grand jury's role in law enforcement. At 344, 94 S.Ct. at 618 the Court said:

> In *Branzburg*, the Court had occasion to reaffirm the importance of the grand jury's role:
>
> > "[T]he investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen . . . ." 408 U.S., at 700 [92 S.Ct., at 2666.]
>
> > "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. . . . 'When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation.' *Wood v. Georgia,* 370 U.S. 375, 392 [82 S.Ct. 1364, 1374, 8 L.Ed.2d 569] (1962). A grand jury investigation 'is not fully

carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' *United ed States v. Stone,* 429 F.2d 138, 140 (CA2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. *Costello v. United States,* 350 U.S., at 362 [76 S.Ct. 406 at 408]. It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made  .  .  .  ." *Id.,* at 701–702, 92 S.Ct., at 2666.[7] (Footnote added)

To this end the grand jury must call witnesses in the manner best suited to perform its task, and the witnesses are legally bound to give testimony, as " 'the public .  .  . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege." *Branzburg v. Hayes, supra,* 408 U.S. at 688, 701, 92 S.Ct. at 2660; and *United States v. Mandujano,* 425 U.S. 564, 572, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). *Cf. United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and *Kastigar v. United States,* 406 U.S. 441, 443–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

I recognize, however, that the grand jury cannot compel an indicted defendant unknowingly to incriminate himself on charges on which he stands accused. As noted by Mr. Justice Brennan in *United States v. Mandujano,* 425 U.S. at 594, 96 S.Ct. at 1785 (Brennan, J., concurring in judgment):

It is clear that the government may not in the absence of an intentional and knowing waiver call an indicted defendant before a grand jury and there interrogate him concerning the subject matter of a crime for which he already stands formally charged. *Lawn v. United States,* 355 U.S. 339 [78 S.Ct. 311, 2 L.Ed.2d 321] (1958); *United States v. Calandra,* 414 U.S. at 345, 346 [94 S.Ct., at 618, 38 L.Ed.2d, at 569]. The Fifth Amendment requires suppression of any statements of the accused that were so obtained.

Professor Moore states:

It is improper for the government to utilize a grand jury for the sole or dominating purpose of obtaining information in preparation for the trial of an already pending indictment. But the grand jury proceeding would not be improper where another purpose is predominant notwithstanding that the government may derive incidental benefit therefrom. (8 Moore's *Federal Practice* ¶ 6.04 at 6–69 (1976))

Thus, this Court in *United States v. George,* 444 F.2d 310, 314 (6th Cir. 1971), stated:

So long as it is not the sole or dominant purpose of the grand jury to discover facts relating to his pending indictment,

---

7. As noted by Justice Brennan in *United States v. Mandujano,* 425 U.S. 564, 587–88 n. 5, 96 S.Ct. 1768, 1782, 48 L.Ed.2d 212 (1976), (Brennan, J., concurring in judgment):

5 "Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. See Ploscowe, The Development of Present-Day Criminal Procedures in Europe and America, 48 Harv.L.Rev. 433, 457–458, 467–473 (1935). Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. 'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed., 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands." *Watts v. Indiana,* 338 U.S. 49, 54 [69 S.Ct. 1347, 1350, 93 L.Ed. 1801, 1806] (1949).

the Court may not interfere with the grand jury's investigation.[8] (Footnote added)

(This was quoted approvingly in *United States v. Woods,* 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).)

In *United States v. Woods, supra* at 249–50, two witnesses were called before a grand jury which had already indicted numerous defendants in a drug conspiracy. The defendants, however, never made a showing that the sole or dominant purpose of the grand jury proceeding was to prepare the pending indictment for trial, and absent such a showing this Court held that such a proceeding was proper, even though the witnesses "did testify before the grand jury regarding some of the matters at issue in [the defendants'] trial." In fact this Court indicated that the witnesses were "called in order to determine whether other persons not yet indicted were also involved in the conspiracy under investigation." *Id.* at 250.

Similarly, the Eighth Circuit in *United States v. Sellaro,* 514 F.2d 114, 122 (8th Cir. 1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975), said:

Where the purpose of the grand jury proceeding is directed to other offenses, its scope cannot be narrowly circumscribed and any collateral fruits from bona fide inquiries may be utilized by the government.

The First Circuit in *United States v. Doe* (Appl. of Ellsberg), 455 F.2d 1270 (1st Cir. 1972), refused to prohibit a Massachusetts federal grand jury's investigation into other offenses in the Ellsberg-Pentagon Papers controversy, despite a pending trial in California on charges against Ellsberg for the alleged unlawful possession and conversion of the Pentagon Papers. The Court, at 1274, said:

We recognize, in short, that grand jury proceedings cannot be policed in any de-

tail. It is a price we pay for grand jury independence that sometimes people are indicted on the basis of evidence tainted in party by hearsay, *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) or of illegally obtained evidence, *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). Nor is a grand jury narrowly confined in its objectives, *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

(This was quoted approvingly in *United States v. Woods, supra* at 250.)

Necessarily, the Government prosecutors in *Doe* were discouraged from using the Massachusetts grand jury as a discovery device for the pending California trial by the Court's order that a transcript of the proceedings of the Massachusetts grand jury be made available to the California trial court.

As noted by the Court in the case of *In re Grand Jury Investigation (General Motors Corp.),* 32 F.R.D. 175, 183 (S.D.N.Y.), *appeal dismissed,* 318 F.2d 533 (2d Cir.), *petition for cert. dismissed,* 375 U.S. 802, 84 S.Ct. 25, 11 L.Ed.2d 37 (1963):

As for criminal proceedings, so long as the motivating purpose of the grand jury investigation is not the accumulation of evidence for a pending criminal case, the Government may use evidence incidentally acquired in the course of a legitimately instituted grand jury in the pending criminal case. *Application of Texas Co., supra.* [27 F.Supp. 847 (E.D.Ill.1939)]. In the *Texas* case, the Texas Company sought to restrain the Justice Department from presenting evidence concerning alleged antitrust violations to a Texas grand jury. The basis of the objection was the fact that there were indictments pending in another district in which the Texas Company and others were charged with antitrust violations involving the

---

**8.** The majority's characterization of this quote as dictum is incorrect. In *George* the Government was using the grand jury to investigate new matters, not matters under a pending in-

dictment. The above quote was a necessary ingredient to this Court's holding that the grand jury's investigation was proper.

identical facts. In rejecting the proposed interference with the grand jury, the court stated:

"I have no way of knowing whether the facts developed in this matter may help the Government in its prosecution of other indictments. But even if they should be an aid in ascertaining where lies the truth, the goal of all judicial investigations, whatever the result of that truth may be, it is my duty as a court to allow is to be produced, if it is brought to light in a legitimate investigation, as I am assured this is."

*Application of Texas Co., supra,* 27 F.Supp. at 851.

*Cf. United States v. Kovaleski,* 406 F.Supp. 267, 269 (E.D.Mich.1976); and *United States v. Pack,* 150 F.Supp. 262, 264 (D.Del. 1957). *See also United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), and *Application of Iaconi,* 120 F.Supp. 589, 591 (D.Mass.1954). *Compare United States v. Braasch,* 505 F.2d 139, 147 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975); *Beverly v. United States,* 468 F.2d 732, 742–44 (5th Cir. 1972); and *In re Pilliteri,* 420 F.Supp. 913 (W.D.Pa. 1976).

Most recently the Supreme Court in *United States v. Wong,* 431 U.S. 174 n. 8, 97 S.Ct. 1823, 1826, 52 L.Ed.2d 231 (1977), stated:

There is no constitutional prohibition against summoning potential defendants to testify before a grand jury. *United States v. Dionisio,* 410 U.S. 1, 10 n. 8 [93 S.Ct. 764, 35 L.Ed.2d 67] (1973); *United States v. Mandujano, supra,* [425 U.S.] at 584 n. 9, 594 [96 S.Ct. 1768, 1780, 1785, 48 L.Ed.2d 212] (Brennan, J. concurring in the judgment). The historic availability of the Fifth Amendment privilege in grand jury proceedings, *Counselman v. Hitchcock,* 142 U.S. 547 [12 S.Ct. 195, 35 L.Ed. 1110] (1892), attests to the Court's recognition that potentially incriminating questions will frequently be asked of witnesses subpoenaed to testify before the grand jury; the very purpose of the inquiry is to ferret out criminal conduct, and sometimes potentially guilty persons are prime sources of information.

The thrust of these cases is that a grand jury should not be hampered in its ongoing criminal investigations, *i. e.,* from summoning as witnesses persons already indicted. So long as the grand jury's dominant motive or substantial purpose in questioning these indicted persons is to determine if criminal activity unrelated to the pending indictments has occurred, rather than to question these persons as a pretrial discovery device on the pending indictments, the summoned witnesses cannot claim an abuse of the grand jury process. As I have already noted, in this case the Government had several investigations going against Doss, including the ongoing investigation on the stolen Browning automatic weapons, in which investigation no indictment had been returned when Doss was questioned by the grand jury on November 13, 1972. Clearly, a grand jury investigation called for these purposes, unrelated to the two sealed indictments, was entirely proper.

The crux of this case narrows down to the question of whether Doss had a right to perjure himself before the grand jury. The answer must be "No," lest the investigative function of the grand jury and the public responsibility attendant thereto be critically impaired.

In *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the Supreme Court faced the question of whether, absent the giving of *Miranda* warnings to a grand jury witness, false statements given by the witness to the grand jury must be suppressed in a prosecution for perjury based on those statements. The Court held that even if Mandujano was a "putative defendant", he was not entitled to the full *Miranda* warnings, and that, in any event, he had no right to commit perjury before the grand jury.

Although there was an absence of unanimity with respect to certain parts of the plurality opinion, the entire Court agreed that the Fifth Amendment privilege against self-incrimination does not sanction

the commission of perjury. *See also United States v. Wong*, 431 U.S. 174 n. 1, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977).

Mr. Chief Justice Burger, speaking for the plurality in *Mandujano, supra*, stated, 425 U.S. at 576–77, 96 S.Ct. at 1776:

> In this constitutional process of securing a witness' testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is—and even the solemnity of the oath—cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.

Similarly, our cases have consistently—indeed without exception—allowed sanctions for false statements or perjury; they have done so even in instances where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry. *See, e. g., United States v. Knox*, 396 U.S. 77 [90 S.Ct. 363, 24 L.Ed.2d 275] (1969); *Bryson v. United States*, 396 U.S. 64 [90 S.Ct. 355, 24 L.Ed.2d 264] (1969); *Dennis v. United States*, 384 U.S. 855 [86 S.Ct. 1840, 16 L.Ed.2d 973] (1966); *Kay v. United States*, 303 U.S. 1 [58 S.Ct. 468, 82 L.Ed. 607] (1938); *United States v. Kapp*, 302 U.S. 214 [58 S.Ct. 182, 82 L.Ed. 205] (1937). [Footnote omitted].

Again, at 582–83, 96 S.Ct. at 1779 the plurality continued:

> In any event, a witness sworn to tell the truth before a duly constituted grand jury will not be heard to call for suppression of false statements made to that jury, any more than would be the case with false testimony before a petit jury or other duly constituted tribunal. In another context, this Court has refused to permit a witness to protect perjured testimony by proving a *Miranda* violation. In *Harris v. New York*, 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (1971), the Court held that notwithstanding a *Miranda* violation:

> > "[The Fifth Amendment] privilege cannot be construed to include the right to commit perjury." *Id.*, at 225 [91 S.Ct., at 645, 28 L.Ed.2d, at 4].

> More recently, the Court reaffirmed this salutary principle:

> > "[T]he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass*, 420 U.S. 714, [723, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570, 577] (1975).

> See also *Walder v. United States*, 347 U.S. 62 [74 S.Ct. 354, 98 L.Ed. 503] (1954); *United States v. DiGiovanni*, 397 F.2d 409, 412 (CA7 1968); *Cargill v. United States*, 381 F.2d 849 (CA10 1967); *United States v. DiMichele*, 375 F.2d 959, 960 (CA3 1967).

The fact that here the grand jury interrogation had focused on some of respondent's specific activities does not require that these important principles be jettisoned; nothing remotely akin to "entrapment" or abuse of process is suggested by what occurred here. Cf. *Brown v. United States*, 245 F.2d 549 (CA8 1957). Assuming, *arguendo*, that respondent was indeed a "putative defendant," that fact would have no bearing on the validity of a conviction for testifying falsely. [Footnote omitted]

Mr. Justice Brennan, joined by Mr. Justice Marshall, and Mr. Justice Stewart, joined by Mr. Justice Blackmun, filed concurring opinions. Both Justices Brennan and Stewart quoted with approval from *Bryson v. United States*, 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969) (footnote omitted):

> Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. (*Id.* 425 U.S. at 585, 609, 96 S.Ct. at 1781).

(Quoted approvingly in *United States v. Wong,* 431 U.S. 174, 180, 97 S.Ct. 1823, 1827, 52 L.Ed.2d 231 (1977).)

More recently in *United States v. Wong, supra,* the Supreme Court unanimously held that neither the Fifth Amendment testimonial privilege nor the Fifth Amendment due process requirements protect "a witness who is called to testify before a grand jury while under investigation for possible criminal activity, and who is later indicted for perjury committed before the grand jury," (*id.* 431 U.S. at 174, 97 S.Ct. at 1824) even though no effective warning of the constitutional privilege to remain silent was given. *See also United States v. Washington,* 431 U.S. 181 n. 1, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).

As noted by the Court in *Wong,* 431 U.S. at 178, 97 S.Ct. at 1825.

> As our holding in *Mandujano* makes clear . . . the Fifth Amendment privilege does not condone perjury. It grants a privilege to remain silent without risking contempt, but it "does not endow the person who testifies with a license to commit perjury." *Glickstein v. United States,* 222 U.S. 139, 142 [32 S.Ct. 71, 73, 56 L.Ed. 128] (1911).

Again the Court stated at 1827:

> But, as the Court has consistently held, perjury is not a permissible way of objecting to the Government's questions. . . . Indeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely. *United States v. Knox* [396 U.S. 77] at 82–83 [90 S.Ct. 363, at 366–367, 24 L.Ed.2d 275].

With equal force it may also be stated that the Sixth Amendment privilege likewise does not condone perjury.

A reading of the grand jury transcript in the present case reveals that Doss was fully apprised of his right to remain silent and of his right to confer with an attorney during the questioning. Doss indicated that he understood his Fifth Amendment rights and, in fact, he left the grand jury room nine times in order to consult with his attorney. In such a situation it cannot be said that Doss was compelled to testify falsely before the grand jury; rather, the record reflects that he knowingly perjured himself. *See generally United States v. Washington, supra.*[9]

The majority's reference to the revival of the practices of the Star Chamber is an extravagant analogy. Doss was informed of his constitutional rights, and he often conferred with his attorney outside the grand jury room. Moreover, the dominant purpose of the grand jury's questions was to investigate specific criminal activities outside the scope of the sealed indictments.

The claim that Doss' Sixth Amendment rights were violated by the fact that his attorney was not invited to come into the grand jury room during the proceedings, is frivolous.

The grand jury's public responsibility for effective law enforcement requires broad investigative powers which should not be so restricted as to undermine the very integrity of the grand jury process. I am of the opinion that the convictions on Counts III and IV of the perjury indictment should be affirmed.

---

**9.** On the same day that *Wong* was decided, the Supreme Court in *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), held that the testimony given by a grand jury witness, who was a putative or potential defendant and who was given *Miran*-*da*-like warnings prior to his testimony, "may be used against him in a later prosecution for a substantive criminal offense," even though "the witness was not informed in advance of his testimony that he is a potential defendant in danger of indictment." *Id.* at 1816.